UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 06-133-02ML |
| | ) | |
| WILLIE WALKER | ) | |

MOTION FOR FUNDS TO HIRE AN INVESTIGATOR AND STATISTICAL CONSULTANT

The defense requests leave to hire an investigator and statistical consultant. In support of said motion, the defendant submits the attached memorandum of law. The defendant has court appointed counsel, but has elected not to file this motion for funding ex parte.

CERTIFICATION PURSUANT TO 18 U.S.C. section 3161(h)

Pursuant to Rule 12(f) of the Local Rules of the District of Rhode Island for the United States District Court, the filing and disposition of this Motion would constitute excludable time as defined by 18 U.S.C. Section 3161 (h)(1)(f), of an uncertain amount.

There has been previous delay related to the subject matter of this motion, which is excludable of an amount of at least 71 days.

WILLIE WALKER
By his Attorney,

/s/Robert B. Mann____________

Robert B. Mann #153
Mann & Mitchell
610 Turks Head Place
Providence, RI 02903
(401) 351-5770

**CERTIFICATION**

I hereby certify that on this 29th day of June, 2007, I did send a true copy of the within document by electronic means (ECF) to:

Sandra Beckner, AUSA

/s/Robert B. Mann
Robert B. Mann #0153
Mann & Mitchell
610 Turks Head Place
Providence, RI 02903
(401) 351-5770
rmann@conversent.net

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 06-133-02ML |
| | ) | |
| WILLIE WALKER | ) | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FUNDS TO HIRE AN INVESTIGATOR AND STATISTICAL CONSULTANT

I. INTRODUCTION AND STATEMENT OF FACTS

In this case there is no claim and will be no claim that any prosecutor intentionally discriminated on the basis of race. Rather, this is a memorandum which seeks funds to investigate whether or not the statistics related to the filing of an enhancement provide a basis for the defense seeking further relief. The defense makes this disclaimer at the beginning of this memorandum to avoid any misperceptions.

The defendant in this case has pleaded guilty in Count I to conspiracy to distribute and possess with intent to distribute five grams or more of cocaine base and in Count II to possession with intent to distribute five or more grams of cocaine base. The Government filed an information charging prior convictions pursuant to 21 U.S.C. §851 seeking to enhance the minimum penalty to which the defendant is subject to not less than ten years imprisonment, plus other penalties. Two other facts are pertinent to this motion. There is no plea agreement in this case and the defendant is Black.

The essence of this motion is a request for funds to investigate the application of the enhancement against this defendant. At this stage, the defense is not making an allegation of selective prosecution. Rather, the defense is simply seeking the funds to

investigate whether or not there is a basis for such an allegation and/or the basis for a discovery request related to the making of such an allegation. As is explained below, the predicate for such an allegation is not simple.

## II. THE LAW AS TO SELECTIVE PROSECUTION AND THE USE OF STATISTICS TO PROVE THE SAME

The United States Supreme Court has spelled out the requirements for a selective prosecution claim, stating:

> It is appropriate to judge selective prosecution claims according to ordinary equal protection standards. n9 See Oyler v. Boles, supra. Under our prior cases, these standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose. [Footnotes omitted]

Wayte v. United States, 470 U.S. 598, 608 (U.S. 1985). See also United States v. Armstrong, 517 U.S. 456, 465 (U.S. 1996), citing Wayte v. United States.

The Court has also spoken about the use of statistics to show an intent to discriminate. In a case challenging the death penalty on discrimination grounds, the Court said:

> The Court has accepted statistics as proof of intent to discriminate in certain limited contexts. First, this Court has accepted statistical disparities as proof of an equal protection violation in the selection of the jury venire in a particular district. Although statistical proof normally must present a "stark" pattern to be accepted as the sole proof of discriminatory intent under the Constitution, n12 Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 266 (1977), "because of the nature of the jury-selection task, . . . we have permitted a finding of constitutional violation even when the statistical pattern does not approach [such] extremes." Id., at 266, n. 13. n13 Second, this Court has accepted statistics in the form of multiple-regression analysis to prove statutory violations under Title VII of the Civil Rights Act of 1964.

> Bazemore v. Friday, 478 U.S. 385, 400-401 (1986) (opinion of BRENNAN, J., concurring in part). [Footnotes omitted]

McCleskey v. Kemp, 481 U.S. 279, 293-294 (U.S. 1987). At least in the context of the two areas cited above, the Court clearly has accepted the use of statistics to prove intent.

In Footnote 12 from the above passage, the Court also said that in some circumstances statistics could prove a constitutional violation. The Court said:

> n12 Gomillion v. Lightfoot, 364 U.S. 339 (1960), and Yick Wo v. Hopkins, 118 U.S. 356 (1886), are examples of those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation. In Gomillion, a state legislature violated the Fifteenth Amendment by altering the boundaries of a particular city "from a square to an uncouth twenty-eight-sided figure." 364 U.S., at 340. The alterations excluded 395 of 400 black voters without excluding a single white voter. In Yick Wo, an ordinance prohibited operation of 310 laundries that were housed in wooden buildings, but allowed such laundries to resume operations if the operator secured a permit from the government. When laundry operators applied for permits to resume operation, all but one of the white applicants received permits, but none of the over 200 Chinese applicants were successful. In those cases, the Court found the statistical disparities "to warrant and require," Yick Wo v. Hopkins, supra, at 373, a "conclusion [that was] irresistible, tantamount for all practical purposes to a mathematical demonstration," Gomillion v. Lightfoot, supra, at 341, that the State acted with a discriminatory purpose.

McCleskey v. Kemp, 481 U.S. 279, 294, n. 12 (U.S. 1987).

The Court then went on to explain why in the context of a death penalty prosecution, the use of statistics to prove selective prosecution is different from the use of statistics in a jury selection or Title VII claim. The Court focused on the fact that each decision to impose the death penalty was made by a properly constituted jury based on the particular facts of the defendant and the offense. Id. at 294-295. In a footnote, the Court also questioned the application of statistics to decisions to prosecute, though in

large part this question seems related to the fact in Georgia decisions to prosecute are made on a county wide basis and the statistical study in the McCleskey case was a statewide study. Id. at 295, n. 15.

In one of the cases cited above, Untied States v. Armstrong, the Supreme Court defined the standard a defendant had to satisfy in order to be entitled to discovery on a selective prosecution claim. The Court said that in order for a defendant to be entitled to discovery on a selective prosecution claim:

> We think the required threshold -- a credible showing of different treatment of similarly situated persons -- adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.

United States v. Armstrong, 517 U.S. 456, 470 (U.S. 1996). This Court has considered the applicability of United States v. Armstrong in United States v. Roman, 931 F. Supp. 960, 965 (D.R.I. 1996).

Courts and commentators have noted that the burden for obtaining discovery under United States v. Armstrong is high and that there is a certain "Catch 22" element to the requirement. In order to get discovery, a defendant must produce some of the very evidence that would be the subject of the discovery request. As one Court said in commenting upon the statement in United States v. Armstrong that the standard for discovery would not create an insurmountable burden:

> In Armstrong's wake, numerous commentators and courts alike have questioned whether the Supreme Court's reassurance would prove hollow in practice. Most opined that it would, raising virtually the same arguments that Thorpe raises now on appeal. See, e.g., Anne Bowen Poulin, Prosecutorial Discretion and Selective Prosecution: Enforcing Protection After United States v. Armstrong, 34 Am. Crim. L. Rev. 1071, 1098 (1997) ("By requiring the defendant to produce specific evidence of an unprosecuted control group before granting discovery, the

> Court subjects the defendant to a 'Catch 22': the defendant needs discovery to obtain the information necessary to entitle the defendant to discovery."); id. at 1073 ("[The Armstrong] holding creates a barrier few defendants are likely to surmount. Consequently, few selective prosecution claims will receive any meaningful judicial hearing."); Hubbard v. United States, No. 04-80321, 2006 U.S. Dist. LEXIS 29992, 2006 WL 1374047, at *1 (E.D. Mich. May 17, 2006) ("The discovery rule established in Armstrong places a nearly impossible burden on defendants claiming selective prosecution since they cannot prove their claim without discovery and cannot obtain discovery without mustering some evidence in support of their claim.").

United States v. Thorpe, 471 F.3d 652, 663 (6th Cir. 2006), cert. denied, 127 S. Ct. 2154 (2007. The Court then noted that notwithstanding this criticism, the vitality of United States v. Armstrong was reaffirmed in United States v. Bass, 536 U.S. 862 (2002). Id. at 663.

The defense submits that in the light of this case law, a defendant clearly has to present "a credible showing of different treatment of similarly situated persons" to even get to the discovery phase of a selective prosecution claim. What the defense seeks in this case is the funding to determine if that threshold can be satisfied. In the next section, the defense sets forth the factual basis for this request, not for discovery but for funding to develop the evidence necessary to seek discovery.

The defense appreciates that the Government is likely to respond that even with discovery, the defense faces a high hurdle to succeed in a selective prosecution claim based only on statistical evidence. The defense understands that the barrier is high, but it is not an impenetrable barrier and at this stage all the defense is seeking to do is determine if there are facts that warrant discovery with respect to this claim.

## II. THE FACTS IN SUPPORT OF THE REQUEST FOR FUNDING

The first point the defense would make is that most prosecutions for crack cocaine are of African American defendants. See Attachments 1, 2, and 3, the statistical tables from the United States Sentencing Commission Sourcebook for the years 2005 and 2006. The per cent of African American defendants ranged from 81 to 83.2 per cent.[1]

The second point the defense would make is that in the City of Providence, data from the Providence Police Department shows that for 2005, of 203 persons arrested for opium and/or cocaine sale/manufacturing, 104 were White and 97 were Black. See Attachment 4. (These figures were taken from an attachment to a motion filed by the Federal Public Defender in United States v. Forbes, Cr. No. 06-135T. The defense was not able to independently obtain these figures, but has taken the attachment from the motion in the Forbes case.)

Next, the defense would note that crack cocaine defendants are less likely to receive role in the offense adjustments than other drug defendants. See Attachment 5, Table 40 from the United States Sentencing Commission Sourcebook for 2006. They are the most likely to receive no acceptance of responsibility among drug offenders. See Attachment 6, Table 41 from the United States Sentencing Commission Sourcebook for 2006. Among drug defendants, they are the most likely to receive a mandatory minimum sentence, with no safety valve. See Attachment 7, Table 44 from the United States Sentencing Commission Sourcebook for 2006. The median and average sentences for crack defendants are higher than for other drug defendants. See Attachment 8, Figure

[1] The defense notes that the Federal Public Defender filed a motion in United States v. Forbes, Cr. No. 06-135T addressing issues related to the issues raised in this case. The defense believes that the motion was withdrawn. The defense notes the motion, because among other things, some of the analysis and attachments are taken from that motion, either directly or with modifications.

J from the United States Sentencing Commission Sourcebook for 2006. See also Attachment 9, Figure L from the United States Sentencing Commission Sourcebook for 2006 showing mean length of imprisonment for each drug type for the fiscal years 1997 to 2006. The mean for crack is considerably higher than for any other type of drug.

There is another area of statistics of likely significance for this case, which is the criminal history data. See Attachment 10, Table 37 from the United States Sentencing Commission Sourcebook for 2006. This table details the criminal history category of drug defendants for each kind of drug. It shows that among drug offenders, 24.1 per cent of crack cases have a criminal history category of 6. No other drug type has more than 12.2 per cent in the criminal history category 6. In criminal history category V, 7.9 per cent of the crack cases fall into this category, while no other drug category has more than 4.2 per cent of the cases in category V. In category IV, the figures are 12.7 for crack and 7.7 for the drug with the next highest percentage. In category III, the figures are 20.4 and 16.1 respectively. Not until one gets to category II, the next to lowest criminal history category, is there any type of drug category which has a higher percentage than crack. In fact for criminal history II, the range is remarkably close. Among drug types, the percentage of offenders with a category II criminal history ranges from a low of 10.0 per cent to a high of 13.5 per cent. Category I criminal history reveals a remarkable turnaround. Among crack offenders, only 22.4 of the defendants are in this category. For other types of drug offenders, the range is 49.4 per cent to 66.3 per cent.

What the data in Table 37 shows is that crack offenders have a higher criminal history category than any other type of drug offender. The data does not show that enhancements are more likely to be applied to crack offenders than other offenders, but

the defense submits that the higher criminal history category of crack offenders would appear to make them more prone to an enhancement for prior convictions.

There is one other area of statistics of interest from data published by the United States Sentencing Commission. The Commission publishes statistics on federal sentencings showing various matters by State, District, and Circuit. The 2006 figures for Rhode Island, compared with the national figures are submitted as Attachment 11. See United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2006, District of Rhode Island, at p. 1. (These are all figures for federal sentences only.) They show that nationally among sentenced defendants 35.5 per cent are for drugs. For Rhode Island, the figure is slightly higher, 38.1 per cent. The next figure is that among drug offenders, on a national basis, crack defendants are 21.1 per cent of the total, but for Rhode Island, the figure is 47.9 per cent. Put in other words, percentage wise, slightly more sentenced defendants are drug defendants in Rhode Island than nationally, but among drug defendants, Rhode Island crack defendants are more than twice the national percentage.

III. <u>THE RELIEF WHICH IS SOUGHT</u>

The relief which the defense seeks is very limited at this stage. The defense seeks funding to investigate and obtain data to see if it can make the showing necessary to make a discovery request regarding selective prosecution on the basis of race with respect to the use of enhancements. The claim is further limited by the fact that the defense has made clear that any claim would be predicated only on a statistical showing and the recognition that making such a showing would not be easy. Nevertheless, the

evidence seems strong that persons prosecuted for crack are primarily Black. The evidence is strong also that persons prosecuted for crack have a higher criminal history than other drug defendants. There appears to be some evidence that the rate of prosecution of crack defendants in federal court in Rhode Island is considerably higher than the national average. There is some evidence, though more needs to be developed, that the Providence police arrest significant percentages of whites for opium and/or cocaine offenses, though the defense does not have a breakdown of arrests for crack versus other drugs. There is strong evidence that crack defendants receive higher sentences than other drug defendants. The defense submits that when one considers all of this evidence, funding to investigate whether there is a sufficient basis to make a claim for discovery is warranted.

Related to this request the defense submits as Attachment 12, the curriculum vitae of Daniel Bennett, a graduate student at Brown University. The defense asks permission to hire Mr. Bennett for the purpose of assisting in framing the investigation for which funding is sought in this motion. Mr. Bennett has agreed to consult at the rate of forty dollars per hour.

The defense requests a hearing on this motion. The defense anticipates that at such a hearing, after receipt of the government's response, a figure to be requested could be better determined.

WILLIE WALKER
By his Attorney,

/s/Robert B. Mann____________
Robert B. Mann #153
Mann & Mitchell
610 Turks Head Place
Providence, RI 02903
(401) 351-5770

**CERTIFICATION**

I hereby certify that on this 29th day of June, 2007, I did send a true copy of the within document by electronic means (ECF) to:

Sandra Beckner, AUSA

/s/Robert B. Mann
Robert B. Mann #0153
Mann & Mitchell
610 Turks Head Place
Providence, RI 02903
(401) 351-5770
rmann@conversent.net