No. ______________________

IN THE SUPREME COURT
OF THE UNITED STATES

CHRISTOPHER MICHAEL PIKE,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

MOTION FOR LEAVE
TO PROCEED *IN FORMA PAUPERIS*

The petitioner, Christopher Michael Pike, requests leave to file the attached petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit without prepayment of costs and to proceed *in forma pauperis* pursuant to Rule 39.1 of this Court and 18 U.S.C. §3006A(d)(7). The petitioner was represented by counsel appointed under the Criminal Justice Act in the District of Oregon and on appeal in the Ninth Circuit Court of Appeals, and therefore no affidavit is required.

RESPECTFULLY SUBMITTED this 10 day of July, 2007.

Nancy Bergeson
Attorney for Petitioner

No. ______________________

IN THE SUPREME COURT
OF THE UNITED STATES

CHRISTOPHER MICHAEL PIKE,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

On Petition for Writ of Certiorari
to the United States Court of Appeals
for the Ninth Circuit

# PETITION FOR WRIT OF CERTIORARI

Nancy Bergeson
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123

Attorney for Petitioner

## QUESTIONS PRESENTED

This Court's Sixth Amendment jurisprudence has left unresolved the question whether, where a controverted fact increases the sentencing Guidelines, the Fifth Amendment right to due process of law, which incorporates the reasonable doubt standard as a right of "transcending value," requires that the aggravating fact must be found by a judge beyond a reasonable doubt. Christopher Pike's Guidelines range for unarmed bank robbery increased from 57 to 71 months to 92 to 115 based on the disputed allegation, which was not proven beyond a reasonable doubt, that he possessed a gun during the bank robbery. The question presented is:

> whether, in light of this Court's Fifth and Sixth Amendment jurisprudence, controverted facts that increase the Sentencing Guidelines range must be proved by the government beyond a reasonable doubt either under the Doctrine of Constitutional Avoidance or as a requirement of the Fifth Amendment.

# TABLE OF CONTENTS

Page

Table of Authorities . . . . . . . . . . . . iii

Opinions Below . . . . . . . . . . . . 1

Jurisdictional Statement . . . . . . . . . . . . 2

Constitutional And Statutory Provisions . . . . . . . . . . . . 2

Statement Of The Case . . . . . . . . . . . . 2

Summary Of Reasons For Granting The Writ . . . . . . . . . . . . 3

Reasons For Granting The Writ . . . . . . . . . . . . 6

A. This Court Should Grant Certiorari Because The Standard Of Proof At Sentencing Is An Issue Of Extraordinary Importance That This Court Has Not Addressed In The Post-*Booker* Context . . . . . . . . . . . . 6

1. The Fifth Amendment Requires Proof Beyond a Reasonable Doubt of Sentence Elevating Facts . . . . . . . . . . . . 7

2. The Due Process Reasonable Doubt Standard Is Subject To Greater Protections Than The Identity Of The Factfinder . . . . . . . . 9

3. The *Grier* Majority's Analytic Errors Illustrate The Need For This Court's Review . . . . . . . . . . . . 11

B. Under The Doctrine Of Constitutional Avoidance, The Federal Sentencing Statutes Should Be Construed To Require Proof Of Controverted Facts That Aggravate The Guidelines Range Beyond A Reasonable Doubt . . . . . . . . . . . . 15

C. This Court's Recent Decision In *Rita* Intensifies The Constitutional Doubts Regarding Sentencing Based On Controverted Facts Found By Only A Preponderance Of The Evidence . . . . . . . . . . . . 18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## INDEX TO APPENDICES

Appendix A Memorandum Opinion of the Ninth Circuit

Appendix B Order Denying Rehearing

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Apodaca v. Oregon*,
406 U.S. 404 (1972) .......... 10

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) .......... 8, 9, 11, 14, 15

*Booker v. United States*,
543 U.S. at 239-41 .......... 3, 5, 6, 7, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20

*Clark v. Martinez*,
543 U.S. 371 (2005) .......... 6, 15, 16, 17

*Cunningham v. California*,
127 S. Ct. 856 (2007) .......... 5, 6, 7, 14, 19

*Duncan v. Louisiana*,
391 U.S. 145 (1968) .......... 19

*Glover v. United States*,
531 U.S. 198 (2001) .......... 12

*Hankerson v. North Carolina*,
432 U.S. 233 (1977) .......... 10

*I.N.S. v. St. Cyr*,
533 U.S. 289 (2001) .......... 15, 17

*Ivan V. v. City of New York*,
407 U.S. 203 (1972) .......... 10

*Jones v. United States*,
526 U.S. 227 (1999) .......... 6, 7, 8, 11, 14, 15

*McMillan v. Pennsylvania*,
477 U.S. 79 (1986) .......... 5, 11, 13, 14

*Mullaney v. Wilber*,
421 U.S. 684 (1975) .......... 10, 19

*Ring v. Arizona*,
536 U.S. 584 (2002) .......... 10

*Schriro v. Summerlin*,
542 U.S. 348 (2004) .......... 10

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) .......... 9

*Texas v. Cobb*,
532 U.S. 162 (2001) .......... 13

*United States v. Chase*,
340 F.3d 978 (9th Cir. 2003) .......... 8

*United States v. Dorcely*,
454 F.3d 366 (D.C. Cir. 2006) .......... 8

*United States v. Grier*,
475 F.3d 556 (3rd Cir. 2007) .......... 5, 6, 8, 11, 12, 13, 14, 15, 16, 17, 18

*United States v. Jimenez-Beltre*,
440 F.3d 514 (1st Cir. 2006) .......... 8

*United States v. Kandirakis*,
441 F. Supp. 2d 282 (D. Mass. 2006) .......... 12

*United States v. Pike*,
473 F.3d 1053 .......... 1, 3

*United States v. Pimental*,
367 F. Supp. 2d 143 (D. Mass. 2005) .......... 12

*United States v. Siegelbaum*,
359 F. Supp. 2d 1104 (D. Or. 2005) .......... 12

*Williams v. Florida*,
399 U.S. 78 (1970) .......... 10

*In re Winship*,
397 U.S. 358 (1970) .......... 5, 6, 7, 8, 9, 10, 11, 19

*Yates v. Aiken*,
484 U.S. 211 (1988) .......... 10

**STATE CASES**

*Rita v. United States*,
2007 WL 1772146 (June 21, 2007) .......... 13, 18, 20

**FEDERAL STATUTES**

28 U.S.C. §1254(1) .......... 2

18 U.S.C. § 3553(a) .......... 15, 18

**FEDERAL SENTENCING GUIDELINES**

U.S.S.G. §6A1.3 .......... 15

U.S.S.G. §2B3.1(b)(2) .......... 2

U.S.S.G. §2B3.1(b)(2) .......... 2, 15

No. ____________________

IN THE SUPREME COURT
OF THE UNITED STATES

CHRISTOPHER MICHAEL PIKE,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

On Petition For Writ Of Certiorari To
The United States Court Of Appeals
For The Third Circuit

The petitioner, Christopher Michael Pike, respectfully requests that a writ of certiorari issue to review the judgment of the United States Court of Appeals for the Ninth Circuit entered on April 11, 2007.

**1. Opinions Below**

The Ninth Circuit Court of Appeals reversed the trial court and remanded in *United States v. Pike*, 473 F.3d 1053, on January 17, 2007 (Appendix A). The petitioner requested

rehearing and suggested rehearing *en banc* on the grounds raised herein. The court denied rehearing and rehearing *en banc* on April 11, 2007 (Appendix B).

**2. Jurisdictional Statement**

This Court's jurisdiction is invoked under 28 U.S.C. §1254(1).

**3. Constitutional And Statutory Provisions**

The Due Process Clause of the Fifth Amendment provides in pertinent part that "No person shall . . . be deprived of life, liberty, or property, without due process of law;. . ."

The United States Sentencing Guidelines, §2B3.1(b)(2)(C) provides: ". . . [I]f a firearm was brandished or possessed, increase by 5 levels; . . . ."

**4. Statement Of The Case**

Christopher Pike pled guilty to unarmed bank robbery and was sentenced to 50 months incarceration. Based on Mr. Pike's evidence that he did not possess a gun in the bank, the trial court refused the government's request to increase the offense level by five under U.S.S.G. §2B3.1(b)(2)(C) for possession of a firearm during the offense. The Court found that Mr. Pike's possession of an unloaded revolver in his car over a half-an-hour after the robbery, after he had gone to the credit union and deposited the bank loot into his landlord's account for payment of rent, did not establish that he possessed a gun in the bank. The trial court reached its resolution by employing a standard of clear and convincing evidence to determine the propriety of the increase. Mr. Pike had advocated for a proof beyond a reasonable doubt standard. Def-App. Op. Br. at 4 n. 2 (citing ER 126-28).

On the government's appeal, the Ninth Circuit held that the district court applied an incorrect standard of proof. *United States v. Pike*, 473 F.3d 1053, 1055 (9th Cir. 2007), attached as Appendix A. Although finding that the enhancement would not be warranted unless Mr. Pike actually possessed the gun in the bank, the Ninth Circuit concluded that proof by a preponderance of facts underlying the enhancement was all that was necessary. 473 F.3d at 1059. Even though Mr. Pike had argued that the proper standard of proof to support the enhancement, if not clear and convincing, was proof beyond a reasonable doubt, the Ninth Circuit did not address the argument. Instead, the Ninth Circuit analyzed the issue of the appropriate standard of proof, as between preponderance and clear and convincing, under pre-*Booker* law. Thus, the extraordinarily important, constitutional issue of the proper standard of proof of sentencing enhancements, post-*Booker*, remains to be examined.

**5. Summary Of Reasons For Granting The Writ**

This Court's jurisprudence in the past eight years has revitalized the Sixth Amendment rights to jury trial in the context of determinate sentencing. The Sixth Amendment cases did not, however, resolve the role under the federal sentencing guidelines of the Fifth Amendment's requirement that no fact that exposes a defendant to greater punishment be proved by less than the beyond-a-reasonable-doubt standard. To date, the lower courts have tolerated a preponderance standard, with an exception for clear and convincing evidence for factors that disproportionately affect sentencing. Mr. Pike asks the Court to engage fully in the Fifth Amendment analysis and – either directly under the Constitution or as a matter of

statutory construction – require that, before a controverted fact can increase a Guidelines range, the government must prove the fact beyond a reasonable doubt.

This Court's reasonable doubt jurisprudence establishes that a higher level of protection is due the Fifth Amendment reasonable doubt requirement than the Sixth Amendment question of who makes the determination. This Court manifested the distinction in the contrasting approaches to the form of the right (the Court has approved non-unanimous juries of less than twelve while rejecting dilution of the reasonable doubt standard), the retroactivity of procedural protections of the right (the right to a jury determination is not retroactive while rules implementing the reasonable doubt standard are retroactive), and the emphasis on reliability in implementing the rights (the jury right is fundamental to Anglo-American jurisprudence while the reasonable doubt standard is of "transcending value").

This question is of extraordinary importance. First, the issue can arise in virtually any of about 72,518 Guidelines sentences imposed each year. From misdemeanor cases to cases involving life without parole, the increase in Guidelines with uncharged and unproven conduct can be at issue in any case. Second, the Court needs to address the question because at least some lower courts take the view that only this Court has the authority to declare the standard of proof under the Guidelines. Third, this Court's rules on the Doctrine of Constitutional Avoidance are at issue here, where the lower courts have erroneously limited the application of the applicable rule of statutory construction. Most basically, federal

prisoners are daily receiving sentences for longer periods of incarceration based on facts found only by a preponderance, not beyond a reasonable doubt.

The issue is ripe for review. The Ninth Circuit conspicuously omits any discussion of post-*Booker* burden of proof for Guidelines enhancements. By contrast, the Third Circuit's opinion in *United States v. Grier*, 475 F.3d 556, 561-67 (3rd Cir. 2007) (*en banc*) thoroughly grapples with the Fifth Amendment issue in federal sentencing. *Id.* at 576-82 (Ambro, J., concurring); *id.* at 589-600 (Sloviter, J., dissenting); *id.* at 604-11 (McKee, J., dissenting). The *Grier* dissenters' analysis of *In re Winship*, 397 U.S. 358 (1970), finds strong support in earlier District Court decisions, and in this Court's recent decision in *Cunningham v. California*, 127 S.Ct. 856 (2007). Under determinate sentencing systems such as the Guidelines, a disputed fact that permits a harsher sentence – one that renders an otherwise unreasonably long sentence reasonable – is precisely what triggers the reasonable doubt standard. Under *Winship*, any lesser standard of proof is insufficiently reliable to permit loss of liberty.

The Ninth Circuit's omission of the issue and the *Grier* majority's rejection of the reasonable doubt standard are based on errors that this Court is in the best position to correct. First, the *Grier* majority incorrectly characterized the effect of Guidelines enhancements on the sentence imposed. Second, the court relied on *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), a case involving an indeterminate – not a determinate – sentence and a mandatory minimum sentence – not an increase in a reasonable Guidelines sentence. Third, the court

improperly marginalized *Cunningham* and its reliance on the Fifth Amendment language in *Jones v. United States*, 526 U.S. 227 (1999). Lastly, neither the *Grier* majority nor the dissenters addressed the greater protections afforded the standard of proof for facts, as opposed to who finds the facts.

The Third and Ninth Circuits failed to follow this Court's governing case law regarding the Doctrine of Constitutional Avoidance as a rule of statutory construction. *Clark v. Martinez*, 543 U.S. 371 (2005). Because Congress has not spoken on the standard of proof at sentencing, the lower courts should have applied the Doctrine of Constitutional Avoidance to hold – as a matter of statutory construction – that the reasonable doubt standard applies. The split *Grier* decision establishes the existence of serious constitutional questions that should be avoided if possible.

## 6. Reasons For Granting The Writ

### A. This Court Should Grant Certiorari Because The Standard Of Proof At Sentencing Is An Issue Of Extraordinary Importance That This Court Has Not Addressed In The Post-*Booker* Context.

In *Winship*, this Court held that, under the Fifth Amendment, facts proved by less than the reasonable doubt standard are not sufficiently reliable to justify criminal sanctions. 397 U.S. at 364. In a series of Sixth Amendment cases since 1999, this Court gave new life to the jury trial and reasonable doubt standards, ultimately requiring, through Justice Stevens' merits opinion in *Booker*, that an increase in the presumptive sentence under the Guidelines required Sixth Amendment protections. In Justice Breyer's remedial *Booker* opinion, the

Court found that, by adjusting the statute to make the Guidelines advisory, the judge, rather than a jury, could make Guidelines findings. *Booker*, 543 U.S. at 245-46. The due process roots of this Court's Sixth Amendment jurisprudence require examination of the proper standard of proof to be applied in a Guidelines sentencing based on disputed facts.

*1. The Fifth Amendment Requires Proof Beyond a Reasonable Doubt of Sentence Elevating Facts.*

The right to due process of law in the criminal context – that an accused cannot be deprived of liberty except by proof beyond a reasonable doubt – reflects "a very fundamental assessment of the comparative social costs of erroneous factual determinations." *Winship*, 397 U.S. at 370. The reasonable doubt standard expresses the instruction to "the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Id.* In *Winship*, the factfinder was a judge in a juvenile proceeding, so no question of jury rights arose. Under the Fifth Amendment, *Winship* held that the judge must apply the reasonable doubt standard and could not deny liberty based on a mere preponderance. 397 U.S. at 368.

Although the Supreme Court's recent Sixth Amendment jurisprudence has treated the reasonable doubt standard in tandem with the right to a jury, the *Cunningham* opinion pointed back to the independent Fifth Amendment right. This Court traced the history of the evolving jurisprudence to *Jones v. United States*, 526 U.S. 227 (1999). *Cunningham*, 127 S.Ct. at 864. In *Jones*, the Court applied the Doctrine of Constitutional Avoidance to construe the federal carjacking statute to require Fifth and Sixth Amendment compliance for

findings that the offense resulted in serious bodily injury, thereby increasing the statutory maximum. *Jones*, 526 U.S. at 251-52. The *Jones* opinion includes a detailed review of *Winship* and the essential values embodied in that opinion. *Jones*, 526 U.S. at 240-43. Although not ultimately decided on constitutional grounds, *Jones*' reasoning is based in part on the Fifth Amendment right to proof beyond a reasonable doubt of facts that increase the statutory sentencing range. *Jones*, 526 U.S. at 243 n.6.[1]

In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Court reached the constitutional question left open in *Jones* and held that a fact that increased the statutory maximum for assault – racial motivation – had to be proved in compliance with the Sixth Amendment. *Apprendi* expressly referred back to the due process roots of the reasonable doubt requirement: "Since *Winship*, we have made clear beyond peradventure that *Winship*'s due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" *Apprendi*, 530 U.S. at 484. As *Apprendi* reversed every Circuit on facts increasing the statutory maximum, so *Blakely* first applied the principles of *Apprendi* to determinate

---

[1] Contrary to the *Grier* majority's suggestion, the Fifth Amendment analysis was essential to the *Jones* holding and, therefore, binding. *Jones*, 526 U.S. at 243 n.6. Even if it were dicta, the Third Circuit should have deferred to considered dicta from this Court. *See, e.g.*, *United States v. Dorcely* 454 F.3d 366, 375 (D.C. Cir. 2006) (Supreme Court's considered dicta is effectively binding on courts of appeals); *United States v. Jimenez-Beltre*, 440 F.3d 514, 517 (1st Cir. 2006) (same); *United States v. Chase*, 340 F.3d 978, 995 (9th Cir. 2003) (Kleinfeld, J., concurring) ("[T]he Supreme Court's dictum should speak even more persuasively than usual, since, dictum or not, what the Court says reflects its 'reason and experience.'").

sentencing under a guidelines system, ultimately applied by *Booker* to the federal sentencing guidelines.

Controverted facts at sentencing regarding Guidelines aggravators fit precisely into the category of "determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence." *Apprendi*, 530 U.S. at 484 (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 251 (1998)). Every time a sentencing judge is influenced upward by a controverted aggravated Guidelines fact, the *Winship* principle is violated in the absence of proof beyond a reasonable doubt. More concretely, the Fifth Amendment is violated every time a sentence below the statutory maximum would be unreasonable but for the finding of a contested fact by a preponderance of the evidence. The Fifth Amendment, assessed in the cold light of routine sentencing practices, applies to facts that increase the advisory Guidelines range and reflect a more aggravated offense that warrants stiffer punishment.

2. *The Due Process Reasonable Doubt Standard Is Subject To Greater Protections Than The Identity Of The Factfinder.*

The reasonable doubt standard is of "transcending value" among the guarantees provided by the Constitution. *Winship*, 397 U.S. at 372 (quoting *Speiser v. Randall*, 357 U.S. 513, 525-26 (1958)). The right is so fundamental that any dilution of the standard constitutes reversible, structural error. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993). Further, unlike most procedural rights, this Court has found that the fundamental nature of the right requires that new rules of constitutional criminal procedure related to the reasonable doubt

standard be applied retroactively. *Hankerson v. North Carolina*, 432 U.S. 233, 240-41 (1977) (applying *Mullaney v. Wilber*, 421 U.S. 684 (1975), retroactively); *Ivan V. v. City of New York*, 407 U.S. 203, 204-05 (1972) (applying *Winship* retroactively). Even rules on presumptions that affect the reasonable doubt burden are applied retroactively. *Yates v. Aiken*, 484 U.S. 211, 216-17 (1988).

On the other hand, the Court has noted that jury fact-finding is not necessary as long as reliability is assured by the reasonable doubt standard. The form of jury determinations can include non-unanimous verdicts and verdicts by panels of fewer than twelve jurors. *Apodaca v. Oregon*, 406 U.S. 404, 406 (1972) (less than unanimous jury does not violate Constitution); *Williams v. Florida*, 399 U.S. 78, 86 (1970) (Constitution does not require twelve person juries). And in *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), the Court held that, because the reasonable doubt standard was applied by the judge, the holding of *Ring v. Arizona*, 536 U.S. 584 (2002), requiring jury determination of death sentence based on aggravating factors, need not be applied retroactively. The use of the reasonable doubt standard in the context of judicial factfinding assured that accuracy would not be seriously diminished. *Schriro*, 542 U.S. at 356. In contrast, where facts resulting in a longer sentence are only proved by a preponderance, the reliability is insufficient to allow any increase in the period of incarceration. *Winship*, 397 U.S. at 368.

3. *The Grier Majority's Analytic Errors Illustrate The Need For This Court's Review.*

The lengthy and fractured opinion in *Grier* illustrates the importance of the Fifth Amendment issues and the need for this Court's review. The *Grier* majority based its decision on incorrect assumptions regarding the effect of guideline fact-finding on sentences, the continued viability of pre-*Apprendi* cases, and the role of *McMillan* and *Jones* in Fifth Amendment analysis. These are all areas upon which this Court should have the final word.

First, the assumption that a Guidelines increase does not affect liberty is directly contrary to the real world experience in the trenches of federal sentencing litigation. The majority claimed that no increase in the maximum sentence is involved by factual findings increasing the Guidelines range because they do not "alter[] the judge's final sentencing authority," *Grier*, 475 F.3d at 565, and that the guidelines "inform the district court's discretion without limiting its authority." *Id.* at 568. That is not so.

Most basically, there is a reasonableness ceiling for sentences below the statutory maximum based on the post-*Booker* advisory guidelines. A sentence may be unreasonable and still lower than the statutory maximum. Because the Guidelines are a consideration in determining reasonableness, a sentence that is reasonable based on uncontroverted facts established beyond a reasonable doubt would become unreasonable if based on additional aggravating factors proved by less than the reasonable doubt standard. In addition to this concrete, statute-based maximum exposure, a court exercising its discretion to sentence more harshly, even within the range of reasonableness, is violating the principle of *Winship* as long

as the defendant receives any additional custody based on a fact established only by a preponderance.[2]

The dissenting opinions in *Grier* underscore the importance of the Guidelines determinations on the ultimate sentence. *Grier*, 475 F.3d at 592, 608-09. Similarly, District Court judges have bridled at the thought of sentencing based on a controverted fact not established beyond a reasonable doubt. *See, e.g., United States v. Kandirakis*, 441 F.Supp.2d 282, 304 (D. Mass. 2006); *United States v. Pimental*, 367 F. Supp. 2d 143, 153 (D. Mass. 2005); *United States v. Siegelbaum*, 359 F. Supp. 2d 1104, 1108 (D. Or. 2005). The effect at sentencing is both subjective and objective. Subjectively, within a range of available sentences, any reasonable judge will impose a harsher sentence if, for example, a bank robber carried a gun in the bank; or if a felon who possessed a firearm did so while assaulting an innocent person; or if a drug dealer possessed with intent to distribute six grams, rather than six kilograms, of methamphetamine.[3] Objectively, the "reasonable" sentence for which *Booker* allows appellate review will change – increase – depending on the existence of

---

[2] This Court has found that any increase in the sentencing range constitutes prejudice for the purposes of ineffective assistance of counsel. *Glover v. United States*, 531 U.S. 198, 205 (2001) (where counsel failed to assert a meritorious guidelines position, the Court rejected the argument that such an error could be *de minimis*).

[3] Studies show that the national rate of sentencing in conformance with the sentencing guidelines is 85.9%. *Grier*, 475 F.3d at 609 (McKee, J., dissenting). And sentences outside the range routinely use the Guidelines range as the baseline from which a lower or higher sentence is imposed. "[T]he Guidelines – and their judge-made factual findings – are still the driving force behind federal sentencing." *Grier*, 475 F.3d at 578 n.23 (Ambro, J., concurring) (quoting *Kandirakis*, 441 F.Supp.2d at 297).

aggravating factors identified in the Guidelines. *Rita v. United States*, 2007 WL 1772146 at *6 (June 21, 2007) (approving an appellate presumption of reasonableness for sentences within the Guidelines range).

Second, the *Grier* majority states that the unconstitutional practices of the past 20 years provide the appropriate model for post-*Booker* sentencing. Without citation, the court asserts that there is "every reason to believe that the Supreme Court intended" that the pre-*Booker* practices would continue. *Grier*, 475 F.3d at 561. On the contrary, the holding of *Booker I* is that thousands of defendants suffered increased incarceration based on practices that violated constitutional rights of "transcending value." There may be nostalgia for a system that, as concurring Judge Ambro characterized it, criminalized conduct "on the cheap," creating a "shadow criminal code." *Grier*, 475 F.3d at 574 (Ambro, J., concurring). But for the defendants and the rule of law, the reality is that countless criminal defendants were denied the protection afforded by the Fifth and Sixth Amendments over a period of almost twenty years.

Third, the Third Circuit relied strongly on *McMillan* as controlling authority, when it provides no such support. In fact, despite believing the preponderance standard violates the Constitution, concurring Judge Ambro believed that, until this Court addresses the question, *McMillan* binds the lower courts. *Grier*, 475 F.3d at 575. This is a misreading of *McMillan* because *stare decisis* is limited to the issues raised. *Texas v. Cobb*, 532 U.S. 162, 169 (2001) ("Constitutional rights are not defined by inferences from opinions which did not

address the question at issue."); *see also Booker*, 543 U.S. at 239-41 (limiting the *stare decisis* effect of cases where the relevant constitutional issue was not raised or resolved).

*McMillan* involved a minimum mandatory sentence within an indeterminate sentencing scheme, not the maximum punishment available in a determinate sentencing system like the federal Guidelines regime. Pennsylvania, unlike the Guidelines, had a statutory scheme that resulted in a range: McMillan's crime of aggravated assault (with a judicial finding that he visibly possessed a gun) could be punished by at least five but not more than ten years incarceration. *McMillan*, 477 U.S. at 82, 87. Unlike *Apprendi* and its progeny, no increased available sentence was involved in *McMillan*. Unlike *Blakely* and *Booker*, no determinate sentence based on legislatively approved guidelines was involved. Most importantly, as with the four cases distinguished by the *Booker* merits majority, the issues relevant to this case were neither presented nor resolved. *See Booker*, 543 U.S. at 240 n. 4 (*Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause.").

Fourth, notwithstanding *Cunningham*'s invocation of *Jones* as providing the doctrinal basis for *Apprendi*, the *Grier* majority brushed it off as a mere statutory case. *Grier*, 475 F.3d at 566-68. Dissenting *Grier* Judges Sloviter and McKee make the convincing argument that *Jones* directly addressed constitutional issues and that its reasoning is based on the constitutional analysis. *Grier*, 475 F.3d at 593-94 (Sloviter, J., dissenting); *id.* at 604-06 (McKee, J., dissenting). The extensive discussion of due process and reasonable doubt was

essential to the *Jones* court's reasoning and, further, was adopted by this Court's *Apprendi* reasoning.

**B. Under The Doctrine Of Constitutional Avoidance, The Federal Sentencing Statutes Should Be Construed To Require Proof Of Controverted Facts That Aggravate The Guidelines Range Beyond A Reasonable Doubt.**

The majority in *Grier* failed to correctly apply the Doctrine of Constitutional Avoidance. In footnote 7, the court recognized the statutory silence on the subject – "[18 U.S.C. §] 3553(a) makes no reference to any burden of proof" – but refused to apply the Doctrine of Constitutional Avoidance. *Grier*, 475 F.3d at 567. The *Grier* court's requirement of "ambiguity" fails to honor this Court's repeated application of the Doctrine of Constitutional Avoidance to statutory silence. *See, e.g.*, *Martinez*, 543 U.S. at 402-03 (filling statutory silence regarding length of detention); *I.N.S. v. St. Cyr*, 533 U.S. 289, 326 (2001) (silence in new immigration law regarding retroactivity of relief from deportation).

The federal sentencing statutes do not include any statement about the standard of proof for disputed aggravating Guidelines factors. The Guidelines are similarly silent, referring only to reliable information in U.S.S.G. §6A1.3(a). The only reference to any standard is in the commentary to §6A1.3: "The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." The standard of proof is not delegated to the Commission, however, and is an adjudicatory function. *Booker*, 543 U.S. at 243 (quoting *Mistretta v. United States*, 488 U.S.

361, 393 (1989)).[4] Moreover, Justice Thomas, in his separate opinion in *Booker*, corrected the Commission's mistaken belief:

> The Court's holding today corrects this mistaken belief [that preponderance of the evidence is appropriate]. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

543 U.S. at 319 n. 6 (Thomas, J., dissenting in part). [*See also Grier*, 475 F.3d at 592] (Sloviter, J., dissenting) ("Justice Thomas is not the only one to have commented critically on the statement in the Guideline commentary . . . ;") (citations omitted).

In *Martinez*, 543 U.S. at 380-81, the Court instructed that the Doctrine of Constitutional Avoidance must be applied according to the "lowest common denominator," which under the federal Guidelines should mean proof of penalty-elevating facts beyond a reasonable doubt:

> It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern. . . . In other words, when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail -- whether or not those constitutional problems pertain to the particular litigant before the Court.

---

[4] In fact, the text does not address the resolution of controverted facts that increase a Guidelines range.

The lowest common denominator in the present case would include this Court's example in *Blakely*: "[A] judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it – or of making an illegal lane change while fleeing the death scene." 542 U.S. at 306.[5]

"[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *St. Cyr*, 533 U.S. at 299-300. The Doctrine of Constitutional Avoidance is not a *constitutional* doctrine, but rather a *statutory* doctrine providing courts with guidance in the interpretation of written law:

> The canon [of constitutional avoidance] is not a method of adjudicating constitutional questions by other means . . . . Indeed, one of the canon's chief justifications is that it allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.

*Martinez*, 543 U.S. at 381. The Doctrine of Constitutional Avoidance requires the Court to consider reconstruction of the relevant statutes prior to addressing substantive constitutional issues.

The *Grier* majority dismissed the doctrine of constitutional avoidance based on its erroneous assumption that it applied to ambiguity, not statutory silence. *Grier*, 475 F.3d at

---

[5] The Third Circuit discussed the possibility of a clear and convincing standard but such an analysis derives from a case in which the reasonable doubt standard was not asserted. *Grier*, 475 F.3d at 580 n.25.

8 n.7. The court acknowledged the federal sentencing statute's (18 U.S.C. § 3553(a)) silence on the standard of proof but required ambiguity in addition to statutory silence. Unless Congress explicitly states otherwise, this Court should avoid the serious constitutional question – most recently manifested by the 145-page *Grier* five-way split opinion – by resorting to statutory interpretation.

This Court should interpret the Sentencing Reform Act, as it interpreted the statute in the *Booker* remedial opinion, this time to require proof beyond a reasonable doubt of controverted facts that increase the Guidelines range.

### C. This Court's Recent Decision In *Rita* Intensifies The Constitutional Doubts Regarding Sentencing Based On Controverted Facts Found By Only A Preponderance Of The Evidence.

In *Rita*, this Court, in addressing the standard of review for sentencing appeals, approved a presumption that a sentence within the Guidelines range is reasonable. The Court reviewed Sixth Amendment questions regarding the identity of the decision-maker – judge or jury – not Fifth Amendment questions regarding the standard of proof at the sentencing hearing. The Court's opinion sharpens the constitutional doubts regarding aggravation of the Guidelines range based on controverted facts in three ways.

First, in anticipation of *Rita*, the Third Circuit recognized that a presumption on appeal that guidelines are reasonable creates a "significant danger" of recreating an unconstitutional sentencing scheme. *Grier*, 475 F.3d at 588 n.37 (Ambro, J., concurring) (citing Stephen R. Sady, *Guidelines Appeals: The Presumption of Reasonableness and*

*Reasonable Doubt,* 18 Fed. Sent. R. 170 (2006)). Although the Court found that the judge-made findings permitted such a presumption on appeal – not at trial – the Court did not address the question whether the reliability issues underlying the reasonable doubt standard would create constitutional issues if the presumption was based on controverted facts found by only a preponderance. *Compare Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968) (the Sixth Amendment right to jury trial is fundamental to the fairness required by Anglo-American jurisprudence), *with Winship*, 397 U.S. at 372 (identifying the reasonable doubt standard as of "transcending value" among the guarantees provided by the Constitution). Unless the post-*Booker* standard of proof for controverted facts is beyond a reasonable doubt, the practice of allowing a lower standard institutionalizes burden-shifting that dilutes the Fifth Amendment's requirement in violation of *Mullaney v. Wilbur*, 421 U.S. 684 (1975), and its progeny.

Second, the concurring opinion of Justices Scalia and Thomas, while recognizing the *stare decisis* effect of *Booker*, pointed out the unresolved Sixth Amendment problems with the Guideline scheme, as did Justice Souter's dissent citing to the "gravitational pull" of the Guidelines range. The concerns in the Sixth Amendment context of jury trial were viewed as troublesome: "Under the scheme promulgated today, some sentences reversed as excessive will be legally authorized in later cases only because additional judge-found facts are present; and as Justice Alito argued in *Cunningham*, some lengthy sentences will be affirmed (*i.e.*, held lawful) only because of the presence of aggravating facts, not found by the jury, that

distinguish the case from the mine-run." *Rita*, 2007 WL 1772146, *20 (Scalia, J., concurring). Here, where the standard of review, not the identity of the decision-maker, is the subject of review, the exact same concerns raise a more critical issue because the actual length of sentence is inevitably increased by facts found by less than beyond-a-reasonable-doubt.

Third, the presumption of reasonableness approved in *Rita* contemplated "the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 2007 WL 1772146, at *9. From the time *Blakely* came down and since *Booker*, the role of the reasonable doubt standard has been hotly debated between those recognizing the practical importance of controverted facts that affect the Guidelines, which should require a resolution of the disputed facts beyond a reasonable doubt, and those courts such as the Ninth Circuit that have relied on pre-*Blakely* authority to persist in approving of controverted Guideline ranges proved only by a preponderance. Although *Rita* did not address or resolve the standard of proof question, its reasoning recognized the critical importance of fairness and reliability in reaching a Guideline range that, on appeal, will be accorded a presumption of reasonableness.

Although this Court has not yet addressed whether, under the post-*Booker* guidelines, the Fifth Amendment requires proof beyond a reasonable doubt of controverted Guidelines aggravators, the *Rita* opinion emphasizes the serious constitutional doubts that favor

construction of the sentencing statutes to require the traditional constitutional standard of proof beyond a reasonable doubt of facts that increase the available punishment.

**Conclusion**

The reasonable doubt standard is the fundamental protection against longer sentences based on facts found by a mere preponderance of the evidence. The practical reality is that, based on identified aggravating factors, sentencing judges will impose higher sentences based on controverted facts that are not proved beyond a reasonable doubt. This Court should accept certiorari to decide this exceptional question, which is at issue in every contested sentencing hearing.

For the foregoing reasons, the Court should grant the petition for certiorari.

Respectfully submitted: July 10, 2007.

Nancy Bergeson
Attorney for Petitioner

Stephen R. Sady
Attorney for Petitioner

# APPENDIX A

Westlaw.



**C**
U.S. v. Pike
C.A.9 (Or.),2007.

United States Court of Appeals,Ninth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Christopher Michael PIKE, Defendant-Appellee.
**No. 05-30528.**

Argued and Submitted July 27, 2006.
Filed Jan. 17, 2007.

**Background:** Defendant was convicted pursuant to his plea of guilty before the United States District Court for the District of Oregon, Garr M. King, J., of bank robbery and sentenced to 50 months' imprisonment and three-year term of supervised release. Government appealed sentence.

**Holdings:** The Court of Appeals, Reinhardt, Circuit Judge, held that:

(1) court erred in holding government to heightened standard of proof with respect to enhancement for possessing firearm during crime without considering totality of circumstances;

(2) error was not harmless;

(3) enhancement would not apply under circumstances of case if defendant left firearm in his car; and

(4) court erred in refusing, as matter of law, to apply two-level enhancement for making "threat of death."

Remanded.
West Headnotes
**[1] Sentencing and Punishment 350H ⚷973**

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(H) Proceedings
350HIV(H)2 Evidence
350Hk973 k. Degree of Proof. Most Cited Cases
Whether application of enhancement to advisory Sentencing Guidelines sentence will have extremely disproportionate effect, so as to require use of clear and convincing evidence standard, requires consideration of totality of circumstances. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**[2] Sentencing and Punishment 350H ⚷973**

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(H) Proceedings
350HIV(H)2 Evidence
350Hk973 k. Degree of Proof. Most Cited Cases
Sentencing court erred in holding government to heightened clear and convincing standard of proof with respect to imposition of Guidelines enhancement for possession of gun when it failed to consider totality of circumstances in determining that enhancement would have disproportionate effect on sentence and relied instead solely on fact that enhancement called for five-level increase. U.S.S.G. § 2B3.1(b)(2)(C), 18 U.S.C.A.

**[3] Criminal Law 110 ⚷1177**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1177 k. Sentence and Judgment and Proceedings After Judgment. Most Cited Cases
District court's error in holding government to heightened clear and convincing standard of proof in seeking five-level enhancement under Guidelines for possession of gun during bank robbery without first considering totality of circumstances was not harmless; enhancement would not have had an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

extremely disproportionate effect on sentence, notwithstanding that enhancement was for five levels and increased advisory range from 57 to 115 months to 92 to 115 months. 18 U.S.C.A. § 2113(a) ; U.S.S.G. § 2B3.1(b)(2)(C), 18 U.S.C.A.

**[4] Sentencing and Punishment 350H ⚷726(3)**

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(B) Offense Levels
350HIV(B)3 Factors Applicable to Several Offenses
350Hk726 Dangerous Weapons or Destructive Devices
350Hk726(3) k. Possession and Carrying. Most Cited Cases

Because period of escape under bank robbery statute encompasses only hot pursuit, five-level enhancement for possession of firearm during crime could not be imposed on defendant in event he left gun in his car rather than taking it into bank in backpack during robbery; defendant was not pursued when he fled bank on bicycle and period of flight had clearly ended when defendant completed bicycle trip from crime scene to his car. 18 U.S.C.A. § 2113(a); U.S.S.G. § 2B3.1(b)(2)(C), 18 U.S.C.A.

**[5] Sentencing and Punishment 350H ⚷728**

350H Sentencing and Punishment
350HIV Sentencing Guidelines
350HIV(B) Offense Levels
350HIV(B)3 Factors Applicable to Several Offenses
350Hk728 k. Use or Threat of Force. Most Cited Cases

Sentencing court clearly erred in failing to consider the totality of circumstances when it declined, as matter of law, to impose a two-level enhancement for making "threat of death" on defendant who handed teller a note stating "I have a gun" during bank robbery; if defendant's actions during course of robbery did not deprive words of their ordinary meaning, two-level enhancement would be applicable. 18 U.S.C.A. § 2113(a); U.S.S.G. § 2B3.1(b)(2)(F), 18 U.S.C.A.

Karin J. Immergut, United States Attorney, District of Oregon, Portland, OR; and Gary Y. Sussman, Assistant United States Attorney, Portland, OR, for the plaintiff-appellant.
Nancy Bergeson, Assistant Federal Public Defender, Portland, OR, for the defendant-appellee.

Appeal from the United States District Court for the District of Oregon Garr M. King, District Judge, Presiding. D.C. No. CR-04-00340-GMK.

Before: REINHARDT, TASHIMA, and GRABER, Circuit Judges.
REINHARDT, Circuit Judge:
The government appeals the fifty-month sentence imposed by the district court following Christopher Pike's plea of guilty to bank robbery under 18 U.S.C. § 2113(a). It argues that the district judge applied an incorrect standard of proof in considering whether to impose a five-level enhancement for possession of a firearm and that, under the correct standard, the enhancement was warranted. It further contends ***1055** that the district court, having decided not to impose the five-level enhancement, clearly erred in declining to impose a two-level enhancement for making a threat of death. With respect to the five-level enhancement, we agree that the district court applied an incorrect standard of proof. We remand so that it may apply the correct standard and determine, under that standard, whether Pike possessed a firearm during the robbery. We note, however, that we remand only because the district court erred in its method of calculating what the appropriate advisory Guidelines range would be. We do not intimate that it should impose a sentence within whatever advisory range it properly calculates on remand. With respect to the two-level enhancement, we remand for reconsideration, if necessary, in light of our decision in *United States v. Jennings*, 439 F.3d 604 (9th Cir.2006).

I

On July 15, 2004, Christopher Pike rode his bicycle to the Wells Fargo Hayden Island Branch in Portland, Oregon, and robbed it. He gave a bank

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

teller a handwritten note that stated, "Give me all the money. I have a gun. No bullshit." Pike then held open a backpack into which the teller placed cash and, unbeknownst to Pike, bait bills and an electronic tracking device. The bank manager, who was standing between five and ten feet from the teller, testified at Pike's sentencing hearing that he did not see a gun in Pike's backpack. After receiving a total of $4,495, Pike zipped up the backpack, retrieved the demand note, and left the bank. He fled on the bicycle to his car, which, according to an investigating officer, "he had parked ... a ways away at an apartment complex on the far east end of Jantzen Beach." As far as the record reveals, Pike was not followed while riding his bicycle. He then drove his car to the Rivermark Credit Union, where he deposited $1,050 into his landlord's bank account to pay his rent.

Shortly after Pike fled, the police began to monitor the signal transmitted by the electronic tracking device in his back-pack. Approximately thirty minutes after the robbery, Portland police stopped Pike's vehicle and placed him under arrest. By then, he already had made his rent payment. While Pike was detained in the police car, he made the following unsolicited statement: "I have a 10-month old at home and we couldn't make the rent. This was it." The police searched Pike's vehicle and found the backpack, which contained $3,435 in cash, the bait bills, the electronic tracking device, and an unloaded gun. Officers also found in the vehicle a sweatshirt matching witnesses' description of the shirt Pike wore during the robbery, and a torn-up demand note that read, "Got a Gun Gimme all Moneys No Funny Shit Got Police Radio."

Following his arrest, Pike waived his right to an attorney and was interviewed by a Portland Police Detective. Pike took responsibility for the robbery and claimed that his actions stemmed from his inability to obtain a job or pay rent. He stated that he had a young child at home for whom he was caring because his wife had a severe case of postpartum depression and was unable to do so. He also told the detective that he did not intend to hurt anybody. When asked about the torn demand note found in the car, Pike claimed that he wrote the note a week earlier, but decided against committing the robbery at that time and ripped it up. Pike said that he had discarded the demand note that he actually used during the robbery. In addition, he told the officer that he left the gun in the car when he rode his bicycle to the bank to commit the robbery.

***1056** On May 9, 2005, Pike pled guilty, without the benefit of a plea agreement, to one count of bank robbery under 18 U.S.C. § 2113(a).[FN1] The Probation Office issued a pre-sentence report recommending a base level offense of twenty, a two-level enhancement under U.S.S.G. § 2B3.1(b)(1) for taking the property of a financial institution, and a five-level enhancement under § 2B3.1(b)(2)(C) for possessing a firearm during the bank robbery. The report also recommended a three-level reduction for acceptance of responsibility, resulting in a total offense level of twenty-four. Pike's criminal history points placed him in Category V. The resulting Sentencing Guidelines range was 92 to 115 months.

> FN1. Section 2113(a) states in relevant part as follows:
> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association.... Shall be fined under this title or imprisoned not more than twenty years, or both.
> 18 U.S.C. § 2113(a).

At the September 20, 2005, sentencing hearing, Pike challenged the five-level increase for firearm possession, arguing that there was insufficient evidence that he had the gun while in the bank. The government contended that, even if Pike did not possess the firearm while in the bank, as it believed he did, the evidence that the gun was in the car before and after the robbery was sufficient to trigger the five-level enhancement. The district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judge identified two issues relevant to the five-level increase: (1) whether Pike had a gun in his backpack during the robbery, and (2) "whether or not finding the gun in the backpack at the time of his arrest is sufficient under the possession enhancement." With respect to the first issue and the appropriate standard of proof, the judge found in pertinent part as follows:

On the five-level enhancement, the burden is at least clear and convincing on the part of the Government, since it is a five-level enhancement, and I find that the Government has not proved by clear and convincing evidence that the defendant had the gun while he was in the bank. His testimony was that he left it in the car. This occurred at a time when he's-immediately after his arrest. Such statements are sometimes more credible than others. But also the fact that the backpack was opened to put the money in, and there was no indication that the teller saw a gun or that anyone saw a gun. Given the clear and convincing requirement and the fact that it's a five-level enhancement, I find that there is not clear and convincing evidence that he had the gun while he was in the bank.

The judge also rejected the government's argument that the discovery of the gun in Pike's car approximately thirty minutes after the robbery was sufficient to warrant the enhancement.

The government sought, in the alternative to the five-level enhancement, a two-level enhancement under U.S.S.G. § 2B3.1(b)(2)(F) based upon Pike's purported "threat of death" in the demand note. Although the government acknowledged that at the time of sentencing there was no Ninth Circuit authority holding that a written "I have a gun" statement or a verbal statement to the same effect was sufficient standing alone to warrant the two-level enhancement, it noted that several other circuits had so held. The district judge declined to impose the two-level enhancement:

And the question is, as a matter of law, whether the " I have a gun" is sufficient ***1057** to apply the two-level enhancement.... What do we do? [District Judge] Aiken has said it doesn't apply, and that two-level enhancement wasn't applied to that defendant. In discussing this with other judges at our sentencing conference, I think the judges go both ways on this. I am reluctant to apply the two-level enhancement for threat of death because I do not want to enunciate a rule of law that I'm not certain should apply. And given the uncertain state of law on this and Judge Aiken's opinion, I'm not going to apply that as well.

Absent both contested enhancements,[FN2] Pike's offense level was nineteen, resulting in a Guidelines range of fifty-seven to seventy-one months. The district judge sentenced Pike to fifty months, finding that to be a "just and reasonable sentence," and a three-year term of supervised release. The judge sentenced Pike to less than the applicable Guidelines range as a result of Pike's "attempts at employment, at taking care of [his] family," and his "potential for turnaround." The government appealed.

FN2. Pike did not contest the two-level enhancement for taking the property of a financial institution.

II

A. Five-Level Enhancement

We must address two principal issues with respect to the five-level enhancement for possessing a firearm during the bank robbery: first, whether the district judge applied the correct standard of proof, and second whether, under the correct standard of proof, there was sufficient evidence to warrant the enhancement. The second issue requires a determination of, *inter alia*, the point at which Pike's robbery of the Wells Fargo branch office ended, and whether he possessed the gun for purposes of the enhancement prior to that time.

*Standard of Proof*

[1] *The ordinary standard of proof for factual findings* underlying sentencing enhancements is preponderance of the evidence. *See United States v. Riley*, 335 F.3d 919, 925 (9th Cir.2003). We have held, however, that there are certain

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances in which a clear and convincing standard is appropriate, such as where the enhancement would have " 'an extremely disproportionate effect' " on the sentence. *United States v. Hopper,* 177 F.3d 824, 832-33 (9th Cir.1999) (quoting *United States v. Restrepo,* 946 F.2d 654, 659 (9th Cir.1991) (en banc)); *see also Riley,* 335 F.3d at 925; *United States v. Jordan,* 256 F.3d 922, 927 (9th Cir.2001). There is no " bright-line" rule in the Ninth Circuit governing the application of the extremely disproportionate effect test; rather, courts look to the totality of the circumstances in determining whether the test is met. *See Jordan,* 256 F.3d at 928. We have identified six factors that should be considered: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the burden of proof for the alleged crime; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based upon the extent of conspiracy; (5) whether the increase in number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial Guidelines range " in a case where the defendant would otherwise have received a relatively short sentence." *Id.* ***1058** (internal quotation marks and citation omitted).

[2] Here, the district court failed to consider the totality of the circumstances in holding the government to a clear and convincing standard of proof. Rather, it concluded that a heightened burden was warranted merely because possession of a gun requires a five-level enhancement under § 2B3.1(b)(2)(C): "On the five-level enhancement, the burden is at least clear and convincing on the part of the Government, since it is a five-level enhancement...." In deeming the fact of a five-level enhancement, standing alone, to be controlling, and in failing to consider the totality of the circumstances, the district court erred. *See id.* (holding that, in determining whether to apply a heightened standard at sentencing, "we have looked at the 'totality of the circumstances,' without considering any one factor as dispositive").

[3] The next question is whether the district court's error was harmless. In other words, under the totality of the circumstances, did the five-level enhancement have an extremely disproportionate effect on Pike's sentence? We conclude that it did not.

The parties agree that only two of the *Valensia* factors may be relevant: (1) whether the increase in offense level is less than or equal to four, and (2) whether the length of the enhanced sentence is more than double the length of the sentence recommended by the initial Guidelines range. With respect to the first issue, it is clear that a five-level increase is greater than a four-level increase. The question is whether the second factor applies. Absent the five-level enhancement, Pike's sentencing range is fifty-seven to seventy-one months. A five-level enhancement would result, however, in a sentencing range of 92 to 115 months. Pike argues that the second *Valensia* factor is met because the high point of the enhanced range is more than double the low point of the non-enhanced range. Although that may be true, the comparison urged by Pike is incomplete. Critically, in cases in which we have considered whether a sentence would be doubled due to a contested enhancement, we have compared both the respective high and low points of the relevant Guidelines ranges. *See, e.g., Riley,* 335 F.3d at 927 (holding that a range of forty-one to fifty-one months was *not* more than double a range of twenty-four to thirty months); *Jordan,* 256 F.3d at 929; *United States v. Mezas de Jesus,* 217 F.3d 638, 643 (9th Cir.2000). Here, a comparison of the low and high points of the two Guidelines ranges-fifty-seven to seventy-one months, and 92 to 115 months-reveals that the enhanced range is *not* more than double the non-enhanced range.

Accordingly, the only *Valensia* factor that favors Pike is the one considered by the district court-the enhancement resulted in an increase of more than four in his offense level. As the government argues, we have never in any opinion required a heightened standard of proof solely upon the basis of an enhancement of more than four levels. *See, e.g., United States v. Munoz,* 233 F.3d 1117, 1126-27 (9th Cir.2000) (ruling that a nine-level

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enhancement that more than doubled the applicable Guidelines range warranted a heightened standard); *Hopper*, 177 F.3d at 833 (holding that a seven-level enhancement that resulted in more than doubling the Guidelines range had an extremely disproportionate effect); *but see Riley*, 335 F.3d at 927 (four-level enhancement did *not* trigger clear and convincing standard where Guidelines range did not double).
Nor, after considering the length of the Guidelines ranges, both independently and comparatively, as well as the other relevant circumstances, do we believe that this *__1059__ is an appropriate case in which to do so. Rather, we conclude that, under the totality of the circumstances, the five-level enhancement under § 2B3.1(b)(2)(C) did not warrant a heightened standard of proof at sentencing in this case. The enhancement would not have an extremely disproportionate effect on Pike's sentence and, thus, the district court erred in holding the government to a clear and convincing burden.

*Possession of a Firearm*

[4] *Because we hold that the district court applied an incorrect* standard of proof with respect to the five-level enhancement, we remand for reconsideration the question whether the government met its burden on that issue. On remand, the district court shall first determine whether the government showed, by a preponderance of the evidence, that Pike possessed the firearm while he was in the bank committing the robbery. If the district court concludes that he did, the five-level enhancement is warranted. If the court finds that he did not, but that he left the firearm in the car parked "a ways away" from the bank, it may not impose the five-level enhancement because, in that case, Pike did not possess the gun during the robbery, including any attendant "escape," as we are compelled to construe that term.

Our decision in *United States v. Dinkane*, 17 F.3d 1192, 1199 (9th Cir.1994), is relevant. In *Dinkane*, we held that
Section 2113(a) punishes the *taking* of property belonging to certain financial institutions. The taking continues beyond the immediate scene of the robbery, encompassing the escape.... [T]he crime of unarmed bank robbery continues throughout the period of hot pursuit.

*Id.* (emphasis in original). In doing so, we considered whether the getaway car driver, who did not participate directly in the robbery of a bank, was guilty under § 2113(a). The facts established thatDinkane, directed by [his cousin], quickly drove from the bank. The getaway car was followed by a man who had been watching the car while it was parked in front of the bank.

*Id.* at 1195. In *Dinkane*, we construed the terms "escape" and "hot pursuit" as being coterminous-we used them interchangeably, and concluded that the jury could have reasonably found Dinkane guilty of robbery *at the point* he fled the bank's parking lot followed by a bystander's car. *Id.* Several other circuits agree that "escape," as synonymous with "hot pursuit," is part and parcel of a bank robbery under § 2113(a). *See, e.g., United States v. Williams*, 344 F.3d 365, 372 (3d Cir.2003) (holding that assaults occurring in hot pursuit fell "within the scope of the federal Bank Robbery Act"); *United States v. Mills*, 1 F.3d 414, 419-20 (6th Cir.1993) ("Courts applying the bank robbery statute have concluded that the reference in 18 U.S.C. § 2113(d) to assaults in committing the offense of bank robbery includes injuries caused during hot pursuit from a bank robbery."); *United States v. Pietras*, 501 F.2d 182, 187 (8th Cir.1974) (holding that, under § 2113(a), robbery extends "to a hot pursuit that follows the physical departure from the bank building").

*Dinkane* remains our last word on the question.
Our definition of the term "escape" is consistent not only with the precedent cited above, but also with the Supreme Court's holding in *Carter v. United States*, 530 U.S. 255, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In *Carter*, the Court considered whether the offense described in 18 U.S.C. § 2113(b)-"Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $1,000" from a financial institution-is a lesser included*__1060__ offense of ordinary bank robbery under § 2113(a). *Id.* at 260, 120 S.Ct. 2159. The Court concluded

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that it was not, in part because § 2113(b) requires a taking *and carrying away* of something of value, whereas § 2113(a) requires only a taking. *Id.* (emphasis added); *see also Williams,* 344 F.3d at 373 (holding that, under *Carter,* "the strict elements of a federal bank robbery offense under 18 U.S.C. § 2113(a) do not include 'taking away' "). Thus, we are not persuaded by the Eleventh Circuit's opinion in *United States v. Martin,* 749 F.2d 1514, 1518 (11th Cir.1985), decided before *Carter,* which held that escape does not necessarily conclude when hot pursuit ends because "asportation is an element" of the offense under § 2113(a). After *Carter,* that justification for extending the scope of escape is no longer valid.

In addition, our definition of "escape" as coextensive with "hot pursuit" comports with our case law generally addressing U.S.S.G. § 2B3.1(b)(2)(C). For example, in *United States v. Taylor,* 960 F.2d 115, 116-17 (9th Cir.1992), we held that an enhancement under § 2B3.1(b)(2)(C) was warranted where the defendant showed an outline of a gun underneath a t-shirt, although the record did not reveal whether he actually possessed a gun. We concluded that the fact that the defendant intentionally created the appearance he had a gun was sufficient, because it (1) created greater apprehension in his victims, and (2) increased the likelihood that the police or bystanders would react using deadly force. *Taylor,* 960 F.2d at 116-17; *see also United States v. Boyd,* 924 F.2d 945, 947 (9th Cir.1991) (holding that the same two justifications warranted a § 2B3.1(b)(2)(C) enhancement). Similarly, in the context of hot pursuit, the two rationales for the enhancement would apply because a firearm could create greater apprehension in the pursuers, who also would be more likely to use deadly force than if the would-be escapee did not possess a dangerous weapon. Neither reason, however, would support applying the enhancement during flight, more broadly defined, where there was neither pursuit nor pursuers. In such a case, there would be nobody in whom to instill apprehension, or from whom to increase the likelihood of a violent response.

For the foregoing reasons, we reaffirm our holding in *Dinkane* that the period of escape under § 2113(a) encompasses only hot pursuit. Here, there is no evidence in the record of hot pursuit; indeed, it is evident from the record that Pike was not followed by anyone while he was riding the bicycle to his vehicle. The facts show that either Pike had the gun with him in the backpack that he carried into the bank *or* the gun remained in the car during the actual robbery. In the latter case, an enhancement would be improper because the flight from the bank clearly ended when the defendant completed his bicycle trip from the crime scene to the car, which he then drove to the credit union in order to make a deposit to his landlord's account. Driving the car to the credit union could not, under the circumstances, constitute a part of the flight. Accordingly, if on remand the district court finds that the government has not met its burden of showing, by a preponderance of the evidence, that Pike possessed a gun while in the bank, it may not impose the five-level enhancement under § 2B3.1(b)(2)(C).

B. Two-Level Enhancement

[5] The government further contends that the district court committed clear error in declining to apply, under § 2B3.1(b)(2)(F), a two-level enhancement ***1061** for making a "threat of death." [FN3] With respect to this issue, the district judge considered the following question: "[A]s a matter of law, whether the 'I have a gun' is sufficient to apply the two-level enhancement." The judge concluded that, based on the status of the law in our circuit at the time, it was not.

FN3. We note that the government sought the two-level enhancement as an alternative to the five-level enhancement. Accordingly, if the district court determines on remand that the five-level enhancement is warranted, it need not reach the issue of the two-level enhancement.

A threat of death includes an "oral or written statement, act, gesture, or combination thereof," where a defendant engages in conduct that would instill the fear of death in a reasonable person who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is a victim of the offense. U.S.S.G. § 2B3.1, cmt. n6. In *United States v. Jennings*, 439 F.3d 604, 611 (9th Cir.2006), issued after Pike's sentencing, we ruled that "in most, but not all, circumstances, statements such as 'I have a gun' *are* sufficient to instill a fear of death in a reasonable victim and warrant the § 2B3.1(b)(2)(F) enhancement." (Emphasis added.) We declined to adopt a *per se* rule, however: Such statements "will not *always* amount to a threat of death" because it is possible that, under the totality of circumstances, "mitigating circumstances accompanying [the] statement could deprive the words of their ordinary and expected meaning." *Id.* (emphasis in original).

In view of *Jennings*, the district court's finding that a note such as Pike handed the bank teller is not, as a matter of law, sufficient to warrant the two-level enhancement was erroneous. Thus, we remand the issue to the district court so that it may consider whether, under the totality of circumstances, Pike's actions in this case deprived the words in the note of their ordinary meaning. If they did not, the two-level enhancement for making a threat of death would be applicable.

III

We conclude that, under the totality of the circumstances, the district court erred in requiring the government to meet a clear and convincing standard with respect to the five-level enhancement for possessing a firearm during the bank robbery. We remand for reconsideration whether, under a preponderance of the evidence standard, the government showed that Pike possessed a firearm during the robbery. Because, under *Dinkane*, robbery under 18 U.S.C. § 2113(a) continues only through the period of "hot pursuit," the five-level enhancement is appropriate only if the government shows that Pike had the gun while actually in the bank. If the district court finds that the five-level enhancement is not warranted, it shall reconsider, in light of *Jennings*, whether to impose the two-level enhancement for making a threat of death.

**REMANDED.**

C.A.9 (Or.),2007.
U.S. v. Pike
473 F.3d 1053, 07 Cal. Daily Op. Serv. 576, 2007 Daily Journal D.A.R. 770

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX B

RECEIVED
APR 13 2007
FEDERAL PUBLIC DEFENDER

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED
APR 11 2007
CATHY A. CATTERSON CLERK
U.S. COURT OF APPEALS

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

CHRISTOPHER MICHAEL PIKE,

Defendant - Appellee.

No. 05-30528

D.C. No. CR-04-00340-GMK
District of Oregon,
Portland

ORDER

Before: REINHARDT, TASHIMA, and GRABER, Circuit Judges.

The panel has voted unanimously to deny the petitions for rehearing and rehearing en banc. The full court has been advised of the petitions for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petitions for rehearing and rehearing en banc are denied.

No. ______________________

IN THE

SUPREME COURT OF THE UNITED STATES

CHRISTOPHER MICHAEL PIKE,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

On Petition For Writ Of Certiorari To

The United States Court Of Appeals

For The Ninth Circuit

CERTIFICATE OF SERVICE AND MAILING

I, Nancy Bergeson, counsel of record and a member of the Bar of this Court, certify that pursuant to Rule 29.3, service has been made of the within MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* and PETITION FOR WRIT OF CERTIORARI on the

counsel for the respondent by depositing in the United States Post Office, in Portland, Oregon on July 10, 2007, first class postage prepaid, a certified true, exact and full copy thereof addressed to:

Mary H. Williams
Solicitor General of Oregon
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

Paul Clement
Solicitor General of the United States
Room 5614
Department of Justice
950 Pennsylvania Avenue, N. W.
Washington, DC 20530-0001

Further, the original and ten copies were mailed to the Honorable William K. Suter, Clerk of the United States Supreme Court, by depositing them in a United States Post Office Box, addressed to 1 First Street, N.E., Washington, D.C., 20543, for filing on July 10, 2007, with first-class postage prepaid.

DATED this July 10, 2007.

Nancy Bergeson
Attorney for Petitioner

SUBSCRIBED AND SWORN to before me this July 10, 2007.

OFFICIAL SEAL
JILL C DOZARK
NOTARY PUBLIC-OREGON
COMMISSION NO. 398412
MY COMMISSION EXPIRES OCTOBER 28, 2009

Notary Public of Oregon
My Commission Expires: 10/28/2009